[No. H015564. Sixth Dist. June 12, 1998.]

MONA LISA ORTEGA et al., Plaintiffs and Respondents, v.
PAJARO VALLEY UNIFIED SCHOOL DISTRICT, Defendant and
Appellant.

COUNSEL

Jackson, Tufts, Cole & Black, Gerald Z. Marer, Amy E. Margolin, Marily P. Lerner, Collins & Schlothauer and Mark S. Collins for Plaintiffs and Respondents.

Robinson & Wood, Thomas R. Fellows and Weldon S. Wood for Defendant and Appellant.

OPINION

COTTLE, P. J.—A teacher employed by defendant Pajaro Valley Unified School District (District) sexually molested a student, plaintiff Mona Lisa Ortega (Mona Lisa), in 1986. The same teacher molested another student, plaintiff Victoria Manley (Victoria), in 1988 and 1989. Neither student filed governmental claims with the District until 1993, the same year they filed the instant action. The trial court ruled in pretrial motions that the plaintiffs'[1] action was time barred unless the factfinder found that the District was equitably estopped to assert its late claim, claim notice and statute of limitations defenses.

Following a three-week jury trial, the jury determined that the District was equitably estopped from claiming these defenses. It further found that the District was 100 percent responsible for plaintiffs' injuries and that the amount of plaintiffs' damages was $4,312,500. On appeal, the District argues that (1) the evidence was insufficient to support the application of equitable estoppel, (2) the allocation of 100 percent fault to the District and none to the molester was not supported by the evidence, and (3) the damages were excessive.

We agree that the evidence does not support the application of equitable estoppel as to plaintiff Victoria and her parents. The record is devoid of evidence that the District or its agents engaged in affirmative acts which induced the Manley plaintiffs not to file a claim within six months, or not to file a late claim request within one year, or not to file an action within two years of the molestations. Hence, as to the Manley plaintiffs, we reverse the judgment with instructions to the trial court to enter judgment in favor of the District. With respect to the Ortega plaintiffs, we conclude that the evidence supports the application of equitable estoppel but does not support the finding that the District was 100 percent responsible for all the Ortegas' damages. Accordingly, we shall remand for a new trial on the issue of fault allocation.

[1]Plaintiffs included Mona Lisa and her father. and Victoria and her mother and father.

## I. FACTS

### A. What the District Knew About the Molesting Teacher Before the Molestations That Are the Subject of this Lawsuit.

#### 1. Hiring of the Teacher

A month after Joseph Ancira received his bachelor's degree from the University of California, Santa Cruz, he was hired as a teaching intern by defendant District. He had applied for, and was awaiting, his teaching credential.

#### 2. 1975 Incident

While Ancira was an intern at H. A. Hyde (elementary) School, he was apparently accused of fondling four young girls.[2] One of the girls was the daughter of a sheriff's deputy, and criminal charges were brought against Ancira on four counts of felony child molestation (Pen. Code, § 288). Ancira was suspended from his teaching position on August 25, 1975, and placed on administrative leave while the criminal charges were being investigated.

Allegedly eight girls testified against Ancira at his trial, four on the charged offenses and four others on uncharged offenses. However, one or more of these girls recanted her testimony under cross-examination. Ancira was represented in these criminal proceedings by Attorney Peter Chang. At the conclusion of a lengthy trial, Ancira was acquitted on February 24, 1976, on all counts.

While the criminal charges were pending, the State Commission on Teacher Credentialing conducted an investigation of Ancira. Following his acquittal, Ancira returned to teaching on March 22, 1976, and the proceedings against his credential at the state level were dropped. Later, Ancira went on to become a fully credentialed, full-time teacher at Pajaro Middle School.

#### 3. 1979 Incident

There were no further complaints or accusations concerning Ancira until 1979. At that time, one or more students and their parents complained to the administration, who met with and reprimanded Ancira. Exactly what the student complaints were was unclear. None of the students or parents involved testified. All three administrators who were involved testified and declared that the complaints had not involved any kind of sexual component

---

[2] No direct evidence of the 1975 events was presented at trial.

or molestation, but had involved some sort of inappropriate familiarity by Ancira.

Robert Buzzone, the school principal, identified the student involved, and testified that the incident concerned Ancira pushing a girl to the ground during an after-school soccer practice. Another administrator, Director of Elementary Education Robert Bowman, recalled the incident somewhat differently. He believed it involved Ancira using inappropriate terms of endearment to female students (e.g., "honey") and touching them inappropriately on the shoulder during after-school athletic events. He stated that he warned Ancira and made a point of memorializing the warning in a memo to show that even "trivial matters" would be taken seriously. The memo stated, "I met today with Joe Ancira in presence of Bob Buzzone to discuss parent and student complaints re inappropriate remarks, patting girls, etc." A third administrator, Superintendent James Baker, did not remember any meeting with Buzzone and Bowman.

Ancira, on the other hand, testified that the incident involved his touching a girl's breast, and the District "solved" the problem by transferring the girl to another classroom. He stated the District took no further action on the 1979 complaint.

### 4. *Attorney Chang Removes Items From the District's Files*

In approximately 1982, Ancira was considering applying for a teaching position in the San Diego area. He wanted to make sure his personnel files contained no derogatory information that would prevent him from securing a job, so he asked his criminal defense attorney, Peter Chang, to review his personnel file.[3] Chang went to the District office and was given free access to Ancira's file. Without any protestation from the District, Chang removed various items that contained derogatory references, including the Kovasevich letter (see pt. D, *post*) and the Buzzone memo, from Ancira's file.

Ancira either did not get the teaching position in San Diego, or he abandoned his plans to move, because he was still teaching at the Pajaro Middle School in 1986. That is when the first allegation pertinent to this lawsuit occurred.

---

[3]The Pajaro Valley Federation of Teachers entered into a collective bargaining agreement with the District in 1984, which permitted employees to remove derogatory information, more than four years old, from their files. The information was not to be destroyed but rather was to be stored in a separate file held by the District. It is unknown whether a similar agreement was in effect in 1982.

B. *The Mona Lisa Incident*

1. *The Molestation; Ancira's Threat*

In 1986, 12-year-old Mona Lisa was a 7th grader in Ancira's English class. Sometime in the fall, Ancira challenged Mona Lisa in front of her entire class to eat a hot chili pepper. This was extremely embarrassing to her. Mona Lisa's parents complained, and the school administration reprimanded Ancira. Later in the fall, probably around December 1986, Ancira was selling pep club T-shirts for a school fund-raiser. Ortega went to his class-room between classes to buy one of the T-shirts. While they were talking, Ancira turned off the lights. He walked up beside Mona Lisa, slid his hand under her sweater, and touched her breast or bra. He kept his hand there for about 30 seconds, while he was panting in her ear. Mona Lisa finally broke away and ran out of the room. She was in shock, but when the bell rang signaling that it was time to go to Ancira's classroom, she went.

After that, Mona Lisa tried to stand up to Ancira in class, but he warned her that if she "disrespect[ed]" him, "he will suspend me so fast I won't know what hit me."

2. *Events of February 5, 1987, the Date Mona Lisa Reported the Molestation*

In early February 1987, Mona Lisa confided to friends that Ancira had molested her. Word spread around school quickly. The school principal, Carlos Garcia, heard about it as soon as he arrived on campus on February 5, 1987.

At approximately 7:30 a.m. that morning, Mona Lisa met with Garcia, who immediately asked the vice-principal, Sesario Escoto, to come into the office and hear what Mona Lisa had to say. Garcia and Escoto allegedly asked Mona Lisa, "are you sure you just didn't misinterpret, are you sure it wasn't just a simple pat on the behind?" She said she was sure, but felt these questions indicated the administration did not believe her.

Whether they believed her or not, Garcia immediately reported the incident to child protective services and the sheriff's office. He also called Mona Lisa's parents and asked them to come in, but he did not tell them the reason they were being called in. Mona Lisa's father worked an hour away at Soledad Prison, and Mona Lisa's mother decided to wait until he was available before she went in. As a consequence, they did not arrive at school until 11:30 a.m. or noon.

The sheriff's office responded immediately. However, Mona Lisa told the uniformed officer who was called in that she did not want to speak with him until her parents arrived. Accordingly, everyone, including Mona Lisa, waited until her parents arrived.

In the meantime, Garcia conferred with the District's legal counsel, who advised Garcia to remove Ancira from his classroom and place him on leave. The evidence is disputed as to whether Ancira continued to teach for the remainder of the day. In any event, he was clearly not teaching by the following day.

While Mona Lisa was waiting in the office with a couple of other students, Ancira stopped in to pick up his attendance sheets and asked, "what was going on?" She did not respond. The office had a big window which faced the student lockers, and other students could see her as she waited. She felt as if she were in a fishbowl.

Later that morning, after Mona Lisa's parents had arrived, she was questioned by police, who commenced an investigation. Mona Lisa's father, Arnold Ortega, testified that he asked Garcia whether Ancira had ever done anything similar in the past. Garcia allegedly said that he had not.

After the police interview, Mona Lisa's parents took her home, and she never returned to Pajaro Middle School after that. A few days later, Mona Lisa's parents enrolled her in a private school.

### 3. *The Next Six Weeks; Police Investigation; Mona Lisa's Recantation*

Mona Lisa was not permitted to attend the school's Valentine's Day dance. According to Principal Garcia, this was because she was no longer a student at the school.[4] Mona Lisa never again spoke or communicated directly with Ancira or the District after she left the school on February 5, 1987.

When Ancira was first charged with the Mona Lisa incident, his attorney, Peter Chang, decided it was time to "engage in propaganda warfare . . . ." He engineered a plan to get "the teachers to start phoning the sheriff's office and Arnold Ortega and whoever to say that Joe Ancira was a good guy and by implication maybe say something about the girl."

In this same time frame, Mona Lisa began receiving "crank" phone calls from unidentified boys who would "make sensual noises on the phone and

---

[4] By February 12, 1987, Mona Lisa's parents were already paying for her tuition at Monte Vista Christian School.

. . . say they wanted to have sex" with her. She also received calls from girlfriends who asked her to "please stop doing this. You could come back to school, we will still be your friends." Mona Lisa testified that some of her friends told her they were calling from the phone in the counselor's office at Pajaro School.[5] Mona Lisa's mother also received calls at her work. The calls were so numerous and so irksome, especially the calls from the boys, that the Ortegas changed their home phone number. Mona Lisa was not invited to a birthday party she otherwise would have been invited to, and everyone shunned her. Ancira was very popular and had friends and relatives everywhere who "adored him."

In the meantime, the sheriff's investigation was progressing. Investigating Officer Halleck interviewed numerous witnesses but was having difficulties with Mona Lisa's "time line." Both her story and her time line had inconsistencies. Establishing a time line was important because "if somebody is saying the event occurred on such and such a day, and it turns out the person wasn't there or the person was there, that's important." Mona Lisa seemed unsure whether the breast-touching incident occurred before or after the chili pepper incident, which had resulted in her parents coming to school and having a conference with the administrators.

Halleck spoke to Mona Lisa's father about this and other inconsistencies, and asked for his assistance in helping to flesh out the facts. In response, Arnold Ortega "grill[ed]" his daughter about the events. He asked, for example, what money she used to buy the T-shirt or if she wrote a check. Under her father's pressure, Mona Lisa recanted her charges.

Arnold Ortega immediately notified the sheriff's office, which shortly thereafter terminated its investigation. The charges against Ancira were dropped, and Ancira was returned from his leave of absence on March 16, 1987.

4. *Ancira's Defamation Action Against Mona Lisa and Her Family; the District's Complaint-in-Intervention*

As he had with the 1975 charges, Ancira vehemently denied Mona Lisa's 1986 accusation. Ancira was apparently a very charismatic person who was able to persuade friends and colleagues that he had been falsely accused again.

---

[5]There was no legally competent evidence presented that the calls were made from the counselor's office. Although the boys who called Mona Lisa were anonymous, the girls were her friends. She identified one by name. Yet none were called to testify. The school counselor, Selso Ruiz, testified unequivocally that no calls were made in his presence, that he would not have allowed students to make calls to Mona Lisa to pressure her to recant, and that his office was locked when he was not in it.

After Mona Lisa recanted her accusations, Chang recommended to Ancira that he file a defamation action against her and her parents. The purpose of the lawsuit, Chang explained, was to discourage Mona Lisa and any others from bringing "false claims" against Ancira.

The Ortegas' homeowners insurance company defended and indemnified the Ortegas in Ancira's defamation action. In discovery in that action, the Ortegas subpoenaed the District's personnel records on Ancira. In response to that subpoena, the District turned over several documents showing that Ancira was placed on leave in 1975 because charges had been filed against him for violating Penal Code section 288 (lewd or lascivious act on a child). However, neither the Kovasevich letter nor the Buzzone memo was included in the records.

In a deposition taken in connection with the defamation action, Mona Lisa was asked whether her accusations against Ancira had been true or false. Under oath, she stated that they had been false. Subsequently, the Ortegas' insurer decided to settle the suit, which it did in October 1988, for $50,000.

Shortly before the defamation suit was settled, the District filed a workers' compensation complaint in intervention in that action. In its complaint, the District sought to recoup $10,000 in disability benefits it had paid to Ancira. The District participated in the settlement and recovered $5,500 on its complaint in intervention.

### 5. From 1988 to 1993

No one from the District heard anything further from Mona Lisa until February 1993, after the charges involving Victoria (see pt. C, *post*) became known. At that time, Mona Lisa filed a government claim. She filed the instant lawsuit in August 1993.

## C. The Victoria Incident

As noted earlier, Ancira was returned to his teaching assignment in March 1987, after Mona Lisa recanted her accusations. He was thus, once again, around young girls. One of his students in the spring of 1988 was 12-year-old Victoria, a bright and popular 7th grader. Victoria was thrilled to be selected for Ancira's "leadership" class. Her older sister had been in one of Ancira's "leadership" classes a couple of years earlier, and she had always heard the best things about him. Victoria was also in Ancira's English class.

### 1. The Molestations

Ancira paid special attention to Victoria, and took her "under his wing." He appointed her to various leadership roles. He flattered her. She wanted to

please him because it made her feel good about herself. However, other times Ancira seemed to turn on her and insult her. He was very manipulative. Ancira often worked with her on school projects, outside school hours and away from school grounds. Starting around January 1988, Ancira began holding her hand and stroking her hair. He also had Victoria sit by his desk in front of the classroom where he would rub her thigh.

On a Saturday in May 1988, Victoria and Ancira were preparing for a pep rally. While they were in the darkened school auditorium, Ancira crept up behind her. He pressed his body against her back and placed his arm around her waist and breast. The incident lasted about 20 seconds and left Victoria feeling confused and awkward.

The next incidents took place the following school year, 1988-1989. Ancira asked Victoria to stay after a softball practice and offered to drive her home. When he dropped her off, he kissed her good-bye. He repeated this same routine (driving her home and kissing her) after numerous after-school activities. Initially the kisses were "dry," "short," "polite but . . . still on the lips." Later he "start[ed] sticking his tongue down [her] throat."

Around March 1988, Ancira asked Victoria to go shopping with him in Salinas to buy prizes for an upcoming school carnival. While she was standing in a deserted store aisle, looking at possible prizes, she felt Ancira's right hand come around her waist and hips, pulling her in towards him. He slipped his hand under the waistband of her stretch pants and over her underwear. After standing still a moment, Victoria jabbed him with her elbow and walked away. She wandered around the store for a half-hour, her heart pounding all the time. She did not want to call her mother because she would have to explain why Ancira had not taken her home, so she looked for Ancira, whom she found at a checkout register. He acted as if nothing had happened. On the way home, he asked her why she was being so quiet, alternating between criticizing her and flattering her.

Shortly thereafter, Ancira asked Victoria to go with him to Toys Galore in Salinas to buy "little consolation prizes, tops and erasers and little dingy things." In the store, Ancira kept putting his hand around her shoulders and touching her face, asking "what do you think of this, you like this, okay, we will buy a hundred of these." At this time he seemed "nice."

Victoria, who was the student body president, and certain other students were asked to go to orientations at Aromas Elementary School to talk to students and parents of students who would be attending Pajaro Middle School the next year. Ancira took them. After the orientation, all of them

went to Victoria's house. While the other students were in Victoria's bedroom, Ancira took her off to the side, put his arm around her waist and "French kissed" her, his mustache brushing into her nostrils. The kiss lasted half a minute or so, but he stopped before the other students came back in.

The last incident occurred in May 1989. Ancira invited several students to his home, but only Victoria showed up. Socorro Ancira, Ancira's wife, was present but went to bed early. Victoria stayed, working on her graduation speech with Ancira. About 9:30 p.m., Victoria fell asleep on Ancira's couch. Around 10 p.m., Ancira leaned over and said, "[I]t's time to go home, I will take you home." Ancira drove a long and circuitous route, stopping at several intersections along the way. Victoria thought that the best way to avoid his attentions would be if she pretended to be asleep, which she did the entire ride home. Nevertheless, she was aware of everything that was going on. At each stop, Ancira would lean over and fondle her. At the last stop, he lifted her sweater, unbuttoned the top button of her jeans, and opened her bra. He also kissed her breast.

When they arrived at her home, Ancira walked to the passenger door, leaned over, and attempted another "French kiss." At that point, Victoria pushed her way out of the car and ran into the house. She did not speak to anyone because she felt nobody would believe her. However, she immediately headed to her diary where she recounted the events of the ride home in great detail.

Victoria never again encountered Ancira face-to-face, although he called her several times the summer after she graduated from middle school. She refused his overtures, however, and he stopped calling.

2. *Victoria Moves on to High School; Reports Molest to Her Mother in May 1990*

During Victoria's freshman year at high school (1989-1990), she suffered both emotionally and physically as a result of the incidents with Ancira. Toward the end of her freshman year, in May 1990, Victoria was on the phone talking to her boyfriend. Victoria's mother overheard her crying and asked her why. Victoria then told her mother about a single incident in which Ancira had molested her when she was in middle school.

Mrs. Manley wanted to report the matter to police, school authorities, and Victoria's father, but Victoria persuaded her not to tell anybody. Victoria said she wanted to deal with the situation in her own way when she was ready. She was afraid nobody would believe her. She had heard about the

incident involving Mona Lisa, and she had seen the way the public rallied behind Ancira. Even her own mother had believed in Ancira.

### 3. *Victoria Refuses to Report Molest and Press Charges Against Ancira Until Her Senior Year in High School*

In Victoria's sophomore year, a detective spoke to her health class about sexual abuse. When the detective asked if anyone had questions, Victoria passed the lecturer a note, asking: "[W]hat would happen to someone if they were charged with molestation?"

She was surprised by the response to her inquiry. The District had notified police. Two uniformed police officers showed up at her house two days later to ask her whether she had been abused. At first Victoria denied it, but when the officers seemed to be zeroing in on her father as her possible abuser, she came to his defense. She told them the abuser had not been her father but rather had been her middle school teacher, Ancira. The officers told her the offense was very serious. They urged her to tell her father and said they would tell him if she refused. When her father was told, he was very supportive and urged her to bring charges against Ancira. The police also asked her to bring charges, but Victoria said she needed to talk about it with her family. The police explained that she could press charges anytime within five years of the date of the offense.[6] Based on that information, Victoria calculated that she could wait until her senior year to report the molestations to the district attorney. She promised the officers that she would come forward at some future time. Victoria thought the officers were supportive of her and wanted to back her up.

After Victoria's father heard of the molestations, he was unsure what he should do. He wanted to respect Victoria's wish to keep quiet about the incident until her senior year. "But [he] just couldn't—[he] didn't feel like just letting it lie." Therefore, he called the child protective services in Santa Cruz, which referred him to another agency, which in turn referred him to the school. He then called the school. He was afraid they would put pressure on Victoria "to come forward right away." However, the person he talked to at school did not seem very interested: "And they said they would look into it. And that was as far as it went. And they didn't seem to want any details or how many times, nothing. She just kind of took the message and said they would look into it." Mr. Manley thought the school "must have just buried it" but "during conversations [in mid- or late 1992] with the district attorney,

---

[6]This "legal advice" obviously referred to bringing criminal charges against the molester. It had nothing to do with applicable statutes of limitation for bringing a civil action against the District.

the sheriff's department had a record that I made that phone call because the school evidently reported the phone call."

### 4. *Charges Filed in 1992; Ancira Pleads No Contest*

On July 5, 1992, Victoria reported the incident to the district attorney's office and "work[ed] with the district attorney's office [to] start the prosecution" of Ancira. A criminal complaint was filed against Ancira in September 1992. That same month, Ancira was suspended from his teaching duties and placed on leave of absence. In September 1992, the District commenced termination proceedings and, in December 1992, filed charges with the Commission on Teacher Credentialing, seeking a revocation of Ancira's credential.

Peter Chang immediately went to work to build up public support in favor of his client. His efforts were somewhat successful. Several fellow teachers signed a "letter to the editor" of a local newspaper on October 25, 1992, when Ancira was still denying the charges, pointing out that "Ancira's accomplishments need to be recognized in light of the allegations outlined by your paper. In his fifteen years of service over two thousand students, both male and female, have benefitted from Mr. Ancira's perseverance, dedication, and work ethic. . . . [¶] These allegations are not tantamount to guilt. It is imperative that members of the community keep an open mind despite the often emotional response to such a painful issue. It is premature to reach any conclusions regarding guilt or innocence. Fortunately, in our country, a person is innocent until proven guilty. . . . Mr. Ancira's devotion to his school, community, and students deserve better than a witch hunt mentality, especially when teachers of his ability are so rare."

In October 1992, Victoria, now a high school senior, was elected homecoming queen. At the homecoming game and various times thereafter, Sylvia Morales, the younger sister of Ancira's wife, Socorro, verbally harassed, insulted, and threatened Victoria. Sylvia was one year older than Victoria and had a part-time job with the District as a security guard.[7] At about this same time, Socorro Ancira, who was employed by the District as an office assistant, allegedly pressured one of Victoria's friends to spread the rumor that Victoria was "loose." The District, if it knew anything about the acts of Sylvia Morales and Socorro Ancira, did nothing to stop them.

---

[7]At trial, plaintiffs' counsel relied heavily on the actions of Morales *as a District employee* in creating an atmosphere of intimidation that would deter Victoria from filing a government claim.

At this time, Victoria was receiving excellent grades. She was well-liked and respected. Both Victoria and her father were impressed by the outpouring of public support and admiration for her.[8] However, they were disappointed when they heard that various friends and relatives of Ancira and fellow teachers had written letters of support on his behalf to the newspaper and to the sentencing judge.

By November 25, 1992, the public's unswerving support of Ancira dissipated. Faced with Victoria's explicit personal diary entries, Ancira pled no contest to the charge against him. Effective December 1, 1992, Ancira permanently resigned and surrendered his credential. He was sentenced on January 6, 1993, and began serving a five-month jail term on January 29, 1993.

### 5. Victoria Files Government Claim and Instant Lawsuit

On July 9, 1993, Victoria filed a governmental claim with the District. The following month, on August 24, 1993, Victoria and her family and Mona Lisa and her family jointly filed a complaint in the Monterey County Superior Court against the District, Joseph Ancira, Socorro Ancira, and Sylvia Morales.

### D. The Anciras and Morales Settle; Trial Against District Proceeds

Prior to trial, Sylvia Morales settled with plaintiffs for $10,000 and the Anciras settled with them for $70,000. The case then proceeded to jury trial against the District. At the time of trial, Mona Lisa was 22 years old; Victoria was 21.

The attorney who represented Ancira in the 1975 criminal proceedings, Peter Chang, testified at length in this trial. Over objection, Chang was allowed to testify that he thought Ancira was "probably guilty" of the 1975 accusations, notwithstanding his acquittal.[9] Chang was also permitted to testify over the District's objection about a letter he had removed from the District's files and then destroyed. The letter was allegedly written to the

---

[8]For example, two teachers in the District wrote a letter to the editor stating, "We would like to take the opportunity to thank the young woman who brought forward the very serious charge of child molestation at a local school. This was a brave and courageous act on her part; one that helped correct an intolerable and dangerous situation. . . . [¶] Our judicial system may seem slow to some, but it is this very thoroughness that respects the rights of both the accused and the accuser. The search for evidence is not a witchhunt; it is a search for truth and justice."

[9]Plaintiff's counsel asked Chang and Ancira to waive the attorney-client privilege in this trial, and they agreed to do so.

District by George Kovasevich, the district attorney who prosecuted the 1975 criminal case against Ancira. In the letter, Kovasevich allegedly railed against the jury for finding Ancira not guilty.[10] According to Chang, Kovasevich attached to the letter juror declarations stating that the jury would have found Ancira guilty had the charges been less serious. Chang described Kovasevich's letter on four occasions as a "diatribe." He likened it to a "sour grapes" letter from a losing attorney. "[I]t was a very nasty letter," Chang complained; "[i]t completely ignored what the jury had found."[11]

Following a three-week trial, the jury returned special verdicts finding: (1) the District was equitably estopped from claiming its "claim notice," "late claim" and statute of limitation defenses; (2) the District was negligent in its hiring, continued employment and supervision of Ancira, which proximately caused damages to all plaintiffs; (3) the District intentionally inflicted emotional distress on the Manley plaintiffs but not on the Ortega plaintiffs; (4) the District was 100 percent responsible for plaintiffs' injuries, except that Arnold Ortega was 15 percent responsible for his own damages; (5) the Ortegas sustained damages of $1,662,500 and the Manleys sustained damages of $2,650,000; and (6) the District was guilty of conspiracy.

## II. Discussion

### A. Introduction and Standard of Review

In pretrial motions, the trial court ruled that plaintiffs' action would be barred by the 100-day and 6-month government claim filing requirement of Government Code section 911.2,[12] the "late claim" provisions of sections 911.4 and 946.6, subdivision (b), and the underlying two-year statute of

---

[10]There was no independent evidence of the Kovasevich letter. Kovasevich did not testify, nor did any other witness having personal knowledge of the 1975 accusations. Further, plaintiffs did not subpoena Kovasevich's letter from the files of the district attorney's office in Santa Cruz although, according to Chang, a copy of the letter would have been maintained.

[11]Chang never testified regarding the date of the Kovasevich letter. The letter, however, would have had to have been written *after* Ancira's acquittal, which occurred on February 24, 1976. At trial, plaintiffs' counsel made much of the fact that the Kovasevich letter was not given by the District to the State Commission on Teacher Credentialing, which was conducting an investigation on whether to reinstate Ancira's teaching credential. The record does not indicate whether the letter had even been written by the time the state commission took its action. The commission made its decision to close its investigation in Ancira's favor in July 1976.

[12]All further statutory references are to the Government Code unless otherwise specified. Section 911.2 currently provides that, "[a] claim relating to a cause of action for death or for injury to person or to personal property . . . shall be presented . . . not later than six months after the accrual of the cause of action." However, the six-month period specified in section 911.2 applies only to actions based on acts occurring on or after January 1, 1988. (See *County of Los Angeles* v. *Superior Court* (1990) 223 Cal.App.3d 163 [272 Cal.Rptr. 600].) For actions

limitations of section 945.6,[13] unless the fact finder determined that the District was estopped to claim these limitations defenses.

The jury here did find that the District was equitably estopped from asserting the timeliness of plaintiffs' claims. A primary issue we address in this appeal is whether the evidence was legally sufficient to support this finding.

■ " '[T]he existence of an estoppel is generally a question of fact for the trier of fact, and ordinarily the [fact finder's] determination is binding on appeal unless the contrary conclusion is the only one to be reasonably drawn from the facts.' " (*Albers* v. *County of Los Angeles* (1965) 62 Cal.2d 250, 266 [42 Cal.Rptr. 89, 398 P.2d 129].) ■ In reviewing the sufficiency of evidence on appeal, we resolve all conflicts in favor of the prevailing party and we indulge all legitimate and reasonable inferences to uphold the verdict if possible. "It is an elementary, but often overlooked principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court." (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].)

Nevertheless, not all evidence is considered substantial. " '[I]f the word "substantial" means anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with "any" evidence. It must be reasonable in nature, credible, and of solid value; it must actually be "substantial" proof of the essentials which the law requires in a particular case.' [Citations.]" (*Beck Development Co.* v. *Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1203-1204 [52 Cal.Rptr.2d 518]; accord, *Hill* v. *National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 51 [26 Cal.Rptr.2d 834, 865 P.2d 633].)

## B. *Cases Applying the Doctrine of Estoppel Against Public Entities*

The California Tort Claims Act (§ 900 et seq.) states that no suit for damages may be maintained against a public entity unless a claim has first

---

based on acts before 1988 (i.e., Mona Lisa's suit), the time for presentation of a claim was "not later than the 100th day after the accrual of the cause of action." (Former § 911.2.)

[13]Section 945.6 provides, in pertinent part, "(a) Except as provided in Sections 946.4 and 946.6 and subject to subdivision (b), any suit brought against a public entity on a cause of action for which a claim is required to be presented in accordance with Chapter 1 (commencing with Section 900) and Chapter 2 (commencing with Section 910) of Part 3 of this division must be commenced: [¶] . . . [¶] (2) If written notice is not given in accordance with Section 913, within two years from the accrual of the cause of action."

been presented to it. (§ 945.4.) It also provides that no suit may be brought against the public entity for personal injuries unless the suit is filed within two-years of the accrual of the cause of action. (§ 945.6.) A cause of action accrues against a public entity for purposes of the claims-presentation statutes on the same date a similar cause of action against a nonpublic entity would be deemed to accrue for purposes of the applicable statute of limitations. (§ 901.)

In certain circumstances, however, courts have recognized that a public entity may be equitably estopped from relying on the claims-presentation statutes or the underlying California Tort Claims Act statute of limitations. (*Farrell* v. *County of Placer* (1944) 23 Cal.2d 624 [145 P.2d 570, 153 A.L.R. 323]; see generally, 3 Witkin, Cal. Procedure (4th ed. 1996) Actions, §§ 292-295, pp. 373-381.)

"Generally speaking, four elements must be present in order to apply the doctrine of equitable estoppel: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury. [Citations.]" (*Driscoll* v. *City of Los Angeles* (1967) 67 Cal.2d 297, 305 [61 Cal.Rptr. 661, 431 P.2d 245].)

"Estoppel most commonly results from misleading statements about the need for or advisability of a claim; actual fraud or the intent to mislead is not essential." (*John R.* v. *Oakland Unified School Dist.* (1989) 48 Cal.3d 438, 445 [256 Cal.Rptr. 766, 769 P.2d 948].) Thus, the doctrine has been applied in the following situations. In *Fredrichsen* v. *City of Lakewood* (1971) 6 Cal.3d 353 [99 Cal.Rptr. 13, 491 P.2d 805], the plaintiff relied on the city's representation that a private corporation, not the city, was responsible for maintaining the sidewalk on which she fell.[14] In *Rand* v. *Andreatta* (1964) 60 Cal.2d 846 [36 Cal.Rptr. 846, 389 P.2d 382], an uneducated plaintiff relied

---

[14]The *Fredrichsen* court stated that estoppel was not dependent on the making of promises or representations as such, but may also be invoked under other factual circumstances showing the public entity acted in an "unconscionable" manner or tried to take "unfair advantage" of the plaintiff, taking into account the totality of the circumstances. The relevant factors to be considered included, "whether or not the inaccurate advice or information is negligently ascertained, whether or to what extent the agency is certain of the information it dispenses, whether the agency purports to advise and direct or merely to inform and respond to inquiries, whether the agency acts in bad faith, whether the claimant is one who purports to have no knowledge or training which would aid him in determining his rights and the public agency purports to be informed and knowledgeable, whether the right of which claimant is being deprived is significant, and whether a confidential relationship exists between the claimant and the public entity." (6 Cal.3d at p. 358.)

on the county's claim agent's representation that she need not obtain counsel and that all her rights would be protected. And in *Bruce* v. *Jefferson Union High Sch. Dist.* (1962) 210 Cal.App.2d 632 [26 Cal.Rptr. 762], an injured student followed the instructions given by his school's officials as to how to protect his rights in case of injury; the student believed he had done everything that was required. Finally, in *Ocean Services Corp.* v. *Ventura Port Dist.* (1993) 15 Cal.App.4th 1762, 1776 [19 Cal.Rptr.2d 750], the port district gave plaintiff verbal and written assurances that it need not take any further action to perfect a claim against the district, and plaintiff reasonably relied on these representations.

Claims of estoppel have been rejected, however, where the plaintiff cannot show calculated conduct or representations by the public entity or its agents that induced the plaintiff to remain inactive and not to comply with the claims-presentation requirements. (See, e.g., *Calabrese* v. *County of Monterey* (1967) 251 Cal.App.2d 131 [59 Cal.Rptr. 224]; *DeYoung* v. *Del Mar Thoroughbred Club* (1984) 159 Cal.App.3d 858 [206 Cal.Rptr. 28]; *Munoz* v. *State of California* (1995) 33 Cal.App.4th 1767, 1786 [39 Cal.Rptr.2d 860].)

In *John R.* v. *Oakland Unified School Dist.*, *supra*, 48 Cal.3d 438, a child molestation case involving a public school teacher, the California Supreme Court held that the doctrine of equitable estoppel could be applied against the school district if the factfinder determined that the teacher's threats prevented the student from pursuing his claim within the statutory period.[15] The court reasoned, "It is well settled that a public entity may be estopped from asserting the limitations of the claims statute where its agents or employees have prevented or deterred the filing of a timely claim by some affirmative act. [Citations.] . . . A fortiori, estoppel may certainly be invoked when there are acts of *violence or intimidation* that are *intended* to prevent the filing of a claim. [Citations.] And here, the teacher's threats to retaliate against John if the boy reported the incidents of sexual molestation allegedly did just that." (*Id.* at p. 445.)

The court in *John R.* v. *Oakland Unified School Dist.*, *supra*, 48 Cal.3d 438, held that the determination of whether the district should be estopped from relying on the claims-presentation statutes was a question of fact for the fact finder. Accordingly, the court remanded the matter to the trial court for a determination of "(1) whether any threats were in fact made by the

---

[15]The district, however, could not be held vicariously liable for a sexual assault committed by its teacher. (*John R.* v. *Oakland Unified School Dist.*, *supra*, 48 Cal.3d at pp. 447-452.) It could be held liable only for its own negligence. i.e., negligent hiring or negligent supervision.

teacher, (2) *when the effect of any such threats ceased,* [and] (3) *whether plaintiffs acted within a reasonable time after the coercive effect of the threats had ended.*" (*Id.* at p. 446; italics added.) (The facts in *John R. v. Oakland Unified School Dist.,* *supra,* 48 Cal.3d 438, were these: In February 1981, the teacher engaged in acts of oral copulation and anal intercourse with John; when John told the teacher he wanted to report the incidents, the teacher threatened him; in December 1981, John reported the molestations to his parents, the district, and the police; in May 1982, 15 months after the molestations, i.e., 15 months after his cause of action accrued, John filed a late-claim application[16] with the district.)

In *Christopher P. v. Mojave Unified School Dist.* (1993) 19 Cal.App.4th 165 [23 Cal.Rptr.2d 353], the court was asked whether a directive by a teacher to an 11-year-old boy he had molested " 'not to tell anyone because "it was not supposed to happen" ' " might be a "sufficient inducement of delay to invoke an estoppel." (*Id.* at pp. 168, 173.) The trial court had held that plaintiff's showing was insufficient to satisfy the *John R. v. Oakland Unified School Dist.,* *supra,* 48 Cal.3d 438, criteria as the teacher had made no overt threat. The trial judge asked, " 'What am I expected to imply from [the teacher's statement], that the teacher threatened to slit his throat, that by implication that the teacher threatened to physically assault or hurt him or by inference I'm supposed to infer that the teacher had threatened to have him thrown out of school? What? . . .' " (*Christopher P. v. Mojave Unified School Dist.,* *supra,* 19 Cal.App.4th at p. 171.)

The appellate court reversed, holding that in conjunction with a sexual molestation, a directive not to tell made by a teacher, a recognized authority figure, to an 11-year-old student "[might] well deter a child from promptly reporting the abuse and thereby protecting his or her right to redress under the Tort Claims Act." (*Christopher P. v. Mojave Unified School Dist.,* *supra,* 19 Cal.App.4th at p. 173.) The court therefore remanded the case to the trial court "for a determination: (1) whether a directive or admonition not to tell was made in conjunction with the alleged molestation, (2) when the effect of the admonition coupled with the molestation ceased, and (3) *whether the appellant acted within a reasonable time, not to exceed one year, after the delay-inducing effect of the molestation and directive ended.* [Citation.]" (*Ibid.,* italics added.) (In *Christopher P. v. Mojave Unified School Dist.,* *supra,* 19 Cal.App.4th 165, the student did not report the abuse until May 16, 1990, six months after the molestation, and did not file his late-claim request until three hundred sixty-four days later. After that application was denied, he filed suit within six months.)

---

[16]Absent tolling, therefore, his late claim application would have been untimely. Late-claim applications can be made within a year of the accrual of the cause of action. (§ 911.4.)

Finally, this court addressed the availability of an estoppel in *Santee* v. *Santa Clara County Office of Education* (1990) 220 Cal.App.3d 702 [269 Cal.Rptr. 605]. We held that plaintiffs, who had erroneously filed their government claim with the county board of supervisors rather than the county office of education, could not rely on estoppel. We noted that the board of supervisors had advised plaintiffs of their error when they "still had two months in which to submit a late-claim application to respondent before the one-year jurisdictional limit expired." (*Id.* at p. 716.) "There are," we explained, "inherent limitations on an otherwise valid estoppel. In *John R.* v. *Oakland Unified School Dist., supra*, 48 Cal.3d at pages 445-446, for instance, the court recognized that a plaintiff cannot rely on an estoppel if there is still ample time to take action within the statutory period after the circumstances inducing delay have ceased to operate." (*Ibid.*)

These cases have the following in common: In each, the public entity or one of its agents engaged in some calculated conduct or made some representation or concealed facts which induced the plaintiff not to file a claim or bring an action within the statutory time; and in each, the plaintiff acted promptly, almost always within a year, after the public entity's conduct which caused the estoppel ceased.

As the court explained in *John R.*, child molest victims who intend to sue a school district are required to "present a written claim to the district within [then 100 days, now 6 months] of the accrual of their causes of action— measured from the date [the child] was molested [Gov. Code, § 911.2]" or are required to "present an application for leave to file a late claim within 1 year of that time, as required by Government Code section 911.4, subdivision (b)." (*John R.* v. *Oakland Unified School Dist., supra*, 48 Cal.3d at pp. 443-444.) The court concluded "that, for purposes of applying equitable estoppel, *the time for filing a claim* against the district *was tolled* during the period that the teacher's threats prevented plaintiffs from pursuing their claims." (*Id.* at p. 445, italics added.) The Supreme Court did not state that plaintiffs were excused from complying with the claims-presentation statutes whenever the district engages in affirmative conduct deterring the filing of a claim. Rather the court stated that the claims-presentation statutes would be *tolled* for that period when the district's actions kept the plaintiffs from filing their claims. This distinction is important. Tolling refers to suspending or stopping the running of a statute of limitations. It is analogous to a clock stopping, then restarting. As far as the claims-presentation statutes are concerned, the clock "stops," according to John R., during those periods when the district's affirmative acts deter the filing of a claim. The clock "starts" again once the effects of those affirmative acts have ceased. (For a discussion of tolling, see e.g., *Russell* v. *Stanford University Hospital* (1997) 15 Cal.4th 783, 785-789 [64 Cal.Rptr.2d 97, 937 P.2d 640].)

## C. *Application of the Doctrine of Estoppel to This Case*

The jury was instructed that it could find the District equitably estopped from relying on the claims-presentation statutes and the underlying statute of limitations under either of two scenarios.

The first was if it found "[1] school district personnel have been apprised of the facts giving rise to the plaintiff's claims, [2] school district personnel must have intended that their conduct would be acted upon by the plaintiffs or must so act that the plaintiffs have a right to believe that it was so intended, [3] plaintiffs must have been ignorant of the true state of facts giving rise to their claims, and [4] plaintiffs must have relied upon or acted upon the conduct by the school district personnel to their detriment." (See *Driscoll* v. *City of Los Angeles, supra,* 67 Cal.2d 297.)

The second was if it found "[D]efendant's agents or employees have deterred the filing of a timely claim by some affirmative act. . . . [¶] Estoppel is available in all circumstances where the district personnel have acted in an unconscionable manner or attempted to take unfair advantage of the claimant, where sexual molestation is alleged, acts of intimidation, threats, coercion, or misrepresentations may create estoppel. The alleged molester's instruction to the victim not to tell could be enough to create estoppel. [¶] The issue of estoppel is to be determined from the totality of the circumstances. You must determine from the totality of the circumstances the following elements: [¶] One, whether any unconscionable acts such as threats, intimidation, coercion or misrepresentations or instruction not to tell were made by the district or by school district personnel, teachers or any other part-time or full time employee, including the alleged molester. [¶] [If] you find one, [then two] when the effect of any such unconscionable acts ceased. [¶] And, three, whether plaintiffs acted within a reasonable time after the effect of the unconscionable acts had ended. [¶] If you determine from the totality of the circumstances that unconscionable acts were made by the defendant or its employees, and that plaintiffs acted within a reasonable time after the coercive effect of those acts had ended, you must find that the defendant is estopped to assert noncompliance with the claims statutes of limitations." (See *John R.* v. *Oakland Unified School Dist., supra,* 48 Cal.3d 438, *Christopher P.* v. *Mojave Unified School Dist., supra,* 19 Cal.App.4th 165, and *Fredrichsen* v. *City of Lakewood, supra,* 6 Cal.3d 353.)

After receiving this complicated instruction, the jury returned its special verdict finding that the District was equitably estopped to assert its claim notice, late-claim and statute of limitations defenses as to all causes of action brought by the Ortega and Manley plaintiffs. In their respective briefs on

appeal, both the District and plaintiffs agree that the second alternative instruction was "the only instruction on which the jury's finding of estoppel could have been based."

In this court, the District contends that "the trial court erred prejudicially in giving [this second alternative] argumentative, incomplete 'formula instruction' on the estoppel issue." (Capitalization omitted.) It cites only the last sentence in the instruction, namely "If you determine from the totality of the circumstances that unconscionable acts were made by the defendant or its employees, and that plaintiffs acted within a reasonable time after the coercive effect of those acts had ended, *you must find that the defendant is estopped* to assert noncompliance with the claims statutes of limitations," and argues that this last sentence was "a virtual directed verdict, compelling the jury to find an estoppel if they determined any type of 'unconscionable act' by any type of District employee, at any time, for any purpose, whether or not acting under any type of authority, and irrespective of whether such 'act' actually had the effect of delaying a claim."

We disagree. This sentence was not given in isolation. It was part of a long, detailed instruction that must be read in its entirety. (*Dorsic* v. *Kurtin* (1971) 19 Cal.App.3d 226, 237 [96 Cal.Rptr. 528].) Other portions of the instruction advised the jury that the unconscionable act of which the District was guilty had to have had the effect of delaying the filing of a claim. Specifically, to hold the District estopped from relying on the claims-presentation statutes, the jury was required to find that "defendant's agents or employees have deterred the filing of a timely claim by some affirmative act."

While we agree that the instruction was not a model of clarity, it fairly accurately described the criteria for finding estoppel set forth in *John R.* v. *Oakland Unified School Dist., supra*, 48 Cal.3d 438, *Christopher P.* v. *Mojave Unified School Dist., supra*, 19 Cal.App.4th 165, and *Fredrichsen* v. *City of Lakewood, supra*, 6 Cal.3d 353. Specifically, it asked the jury to determine if the District engaged in unconscionable acts which deterred the filing of a claim, when the effect of those acts ceased, and if plaintiffs acted within a reasonable time after the effects of the acts ended.

Even if the instruction were flawed, any error in giving it was harmless. ■ "A judgment may not be reversed for instructional error in a civil case 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' (Cal. Const., art. VI, § 13.) . . . [¶] Instructional error in a civil case is prejudicial 'where it seems probable' that the error

'prejudicially affected the verdict.' [Citations.] Of course, that determination depends heavily on the particular nature of the error, including its natural and probable effect on a party's ability to place his full case before the jury. [¶] . . . Actual prejudice must be assessed in the context of the individual trial record." (*Soule* v. *General Motors Corp.* (1994) 8 Cal.4th 548, 580 [34 Cal.Rptr.2d 607, 882 P.2d 298].)

Factors to be evaluated in assessing the prejudicial effect of an erroneous instruction, as enumerated in earlier cases, include: " '(1) the degree of conflict in the evidence on critical issues [citations]; (2) whether respondent's argument to the jury may have contributed to the instruction's misleading effect [citation]; (3) whether the jury requested a rereading of the erroneous instruction [citation] or of related evidence [citation]; (4) the closeness of the jury's verdict [citation]; and (5) the effect of other instructions in remedying the error [citations].' " (*Pool* v. *City of Oakland* (1986) 42 Cal.3d 1051, 1069-1070 [232 Cal.Rptr. 528, 728 P.2d 1163], quoting from *LeMons* v. *Regents of University of California* (1978) 21 Cal.3d 869, 876 [148 Cal.Rptr. 355, 582 P.2d 946]; cf. *Soule* v. *General Motors Corp., supra,* 8 Cal.4th at pp. 580-581.) ▆ In this case, although there were conflicts in the evidence, the jury's verdict was not close; it was unanimous on the Ortegas' claims and Victoria's claim and was 11 to 1 on Mr. and Mrs. Manley's claims. Furthermore, under the authority of *John R.,* there can be no question that the District was, in fact, liable for the acts of its employees that had the effect of deterring the filing of a government claim. The enumerated factors do not suggest a possibility of prejudice in this case. We now turn to the question of whether the jury's finding of estoppel is supported by substantial evidence.

1. *Evidence of Estoppel as Applied to Mona Lisa*

▆ As noted, for estoppel to apply, the jury had to find (1) that the District engaged in unconscionable acts which deterred Mona Lisa from filing a government claim, (2) when the effect of those acts ceased, and (3) whether Mona Lisa filed her government claim within a reasonable time after the effects of the acts ended.

We first consider whether substantial evidence in the record supports the jury's finding that the District engaged in unconscionable affirmative acts that had the effect of deterring Mona Lisa from filing a government claim. As we shall explain, we conclude the evidence does support this finding.

This evidence includes the following. First, Ancira, who is the school's agent (*John R.* v. *Oakland Unified School Dist., supra,* 48 Cal.3d 438),

specifically threatened Mona Lisa, telling her that if she "disrespected" him, he would suspend her "so fast [she] wo[uld]n't know what hit [her]."

Second, school officials "mistreated the Ortegas" on February 5, 1987, when Mona Lisa first reported the incident. They put her in a room with a window (a "fishbowl" as described by Mona Lisa) where all the students could see her. They asked her if she had not misinterpreted what Ancira had done. They did not tell her parents why they were being called in. Mona Lisa's mother would have come in immediately (rather than waiting an hour for her husband to arrive from his workplace in Soledad) had she known the reason she was being called in.

The school even allowed Ancira to go into the office where Mona Lisa was waiting. As he picked up his attendance sheet, Ancira asked Mona Lisa, "What's going on?" She was left alone all morning. When her father asked the principal whether Ancira had done anything like this before, the principal did not tell him about the 1975 acquittals or the 1979 breast-touching incident. Had Mr. Ortega known, he would not have been so likely to question his daughter's veracity.

Third, after Mona Lisa left the school on February 5, 1987, not a single school official ever contacted her to ask her how she was doing or whether she had her homework assignments. Furthermore, the school did not permit her to go to the Valentine's Day Dance. No one from the school ever spoke with Mona Lisa again.

Fourth, Chang testified that he asked several teachers to call the sheriff's office. They were told to give Ancira a positive character reference and Mona Lisa a negative one and to pressure the department into dropping its investigation. Chang testified that he heard that several teachers had done so.[17]

Fifth, Arnold Ortega wrote to school officials and asked about Ancira's prior history. He received no response. Had Ortega known, he would not have "grilled" his daughter when her "time line" had so many inconsistencies. Further, according to Mona Lisa, she would have had the fortitude to resist all outside pressures had her father only believed her.

Sixth, Mona Lisa and her family received harassing calls from students. (However, she presented no competent (i.e., nonhearsay) evidence that the calls were made with the knowledge of, or at the instigation of, the District.)

---

[17]The sheriff's investigator did contact several witnesses, some of whom were teachers. The sheriff, however, testified that no one from the District pressured him to drop the investigation, and plaintiffs presented no competent evidence (e.g., testimony from a teacher who made a call to the sheriff or from an employee of the sheriff's office who received such a call) to support this assertion.

Seventh, the Ortegas testified that they heard that a public address announcement was made at Pajaro Middle School, stating that Ancira had been "cleared" of all charges, and that he was teaching again. (No one who made or heard the announcement testified.) This alleged announcement was humiliating to the Ortegas.

Eighth, Ancira (the District's agent under *John R. v. Oakland Unified School Dist., supra,* 48 Cal.3d 438) brought a defamation action against Mona Lisa. Further, when Ancira was scheduled for a deposition in that lawsuit, the school principal gave him the afternoon off to attend the deposition. Later the District intervened in the defamation action to recoup workers' compensation benefits it paid to Ancira while he was on leave.

Over the next several years, Mona Lisa went from one school to the next, but it seemed that no matter where she went, someone was around who knew that she was the girl who had "falsely accused" a teacher. Her family life was ruined.

Finally, after Victoria contacted the district attorney's office in 1992, Ancira determined to dissuade Mona Lisa from getting any ideas about reviving her own claims against him. (Again, the District is liable under *John R.* for Ancira's acts that deter a claimant from filing a government claim.) He was seen on several occasions driving by Mona Lisa's place of employment.

We next consider whether substantial evidence supports the jury's finding on the second and third prongs of the *John R.* test: when the effect of the District's actions which deterred the filing of a claim and lawsuit ceased, and whether Mona Lisa filed her government claim within a reasonable time after the effect of the acts ended.

The evidence shows that the District or its agents deterred Mona Lisa from taking action until Ancira essentially admitted his pedophilia with his no contest plea in the Victoria Manley case. Initially, Ancira threatened Mona Lisa with suspension. The deterring effect of this act, however, presumably ceased when she was no longer a student at Pajaro Middle School. Then the District "mistreated the Ortegas" on February 5, 1987, which intimidated the shy and withdrawn 12-year-old. The school officials did not appear to believe her, and they withheld Ancira's "history" from her father. She could not deal with the pressure exerted by the school and its officials and by the community and sheriff's department. It was easier to just say it had not happened. Then, after she was in a new school, Ancira sued her and her family for defamation. The District joined in the lawsuit. This little girl once

again said in the defamation action that she had made the whole incident up rather than face the pressure.

Mona Lisa, still a child, could reasonably fear that if she took back her recantation, Ancira and the District would sue her again. And because of res judicata, her chances of prevailing in a subsequent lawsuit would be minimal. Mona Lisa lived in perpetual fear that if she told the truth, she would not be believed and Ancira, Chang, and the District would threaten her, intimidate her, and possibly sue her.

On November 25, 1992, Ancira surprisingly pleaded no contest to one count of child molestation upon Victoria after he was confronted with Victoria's contemporaneous diary entries. At that point for the first time in six years, Mona Lisa had reason to believe the District would take her seriously and would support her. Within two months and one week of Ancira's no contest plea—in other words, within two months and one week of the time when the effects of the acts of intimidation ceased, Mona Lisa filed her government claim. Clearly, this is a "reasonable time" after the delay-inducing actions of the District ceased.

Although the court in *John R. v. Oakland Unified School Dist., supra*, 48 Cal.3d 438, does not specifically define the term "reasonable time," it discusses how the "the time for filing a claim" is "tolled" during the period the delay-inducing effects continue to operate. The "time for filing a claim" and a late-claim request are set forth in the California Tort Claims Act. As a general rule, an injured plaintiff must file a government claim within six months of the accrual of a cause of action, a late-claim request within one year, and a lawsuit within two years. That period is tolled during the time the District's actions deter the appropriate filings. (*John R. v. Oakland Unified School Dist., supra*, 48 Cal.3d at p. 445-446.)

2. *Evidence of Estoppel as Applied to Victoria*

■ With Victoria as with Mona Lisa, the preliminary question we ask is whether the record contains substantial evidence that the District engaged in affirmative acts that dissuaded Victoria from filing a timely government claim. As the court noted in *John R.*, "the accrual of [Victoria's and her parents'] causes of action [is] measured from the date [Victoria] was molested . . . ." (*John R. v. Oakland Unified School Dist., supra*, 48 Cal.3d 438, 443, citing § 911.2.)

It is undisputed that the last act of molestation upon Victoria occurred in May 1989. The clock began running then. She had six months—until

November 1989—to file a government claim, or one year—until May 1990—to file a late-claim request, unless the District or its agents, within this period, engaged in some sort of "unconscionable" affirmative act that induced her to delay filing a claim.[18] If that occurred, the clock would "stop" or be "tolled" for the time during which the effects of the District's act persisted.

The only evidence suggestive of an affirmative act by the District or its agents during this period that might have deterred Victoria from filing a claim or a lawsuit is that Ancira made Victoria fearful. Victoria does not recount any threats made by Ancira, any admonitions not to tell or any other actions taken by Ancira independent of the molestations, but she does testify that she was "scared to death" of him during the time he was molesting her. If being "scared to death" of one's molester is considered akin to the teacher's admonition in *Christopher P.* not to tell because it was not supposed to happen, the time for filing a claim might have been tolled during the period that Victoria was still at Pajaro Middle School and still in contact with Ancira. However, in June 1989, Victoria left the school and never saw Ancira again.

There was no evidence that anyone in the District threatened Victoria or in any way dissuaded her from filing a government claim in the six-month period after she left Pajaro Middle School. Indeed, there was no evidence that the District had knowledge of the molestations. Nor was there evidence of any affirmative act by the District in the following one-year period, in which she could have filed a late claim request, or the two-year period in which she could have brought an action.

As we explained earlier, it is well settled that "four elements must be present in order to apply the doctrine of equitable estoppel: (1) *the party to be estopped must be apprised of the facts*; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury.

[18]Under the law, Victoria is not given any additional time because she was a minor. Code of Civil Procedure section 352 provides, "(a) If a person entitled to bring an action, mentioned in Chapter 3 (commencing with Section 335) is, at the time the cause of action accrued either under the age of majority or insane, the time of the disability is not part of the time limited for the commencement of the action. [¶] (b) *This section does not apply to an action against a public entity or public employee upon a cause of action for which a claim is required to be presented in accordance with Chapter 1* (commencing with Section 900) or Chapter 2 (commencing with Section 910) of Part 3, or Chapter 3 (commencing with Section 950) of Part 4, of Division 3.6 of Title 1 of the Government Code. This subdivision shall not apply to any claim presented to a public entity prior to January 1, 1971." (Italics added.)

[Citations.]" (*Driscoll* v. *City of Los Angeles, supra*, 67 Cal.2d at p. 305.) In Mona Lisa's case, the District was apprised of the fact that Mona Lisa claimed that Ancira molested her. It therefore had a reason to try to induce Mona Lisa not to file a government claim. In Victoria's case, in contrast, the District knew nothing of the molestations until Mr. Manley called the school during Victoria's sophomore year in high school. Without this knowledge, i.e., without being "apprised of the facts," it could not purposefully engage in conduct which would have as its result Victoria delaying in filing her claim.[19]

The only evidence of affirmative acts by District employees that were directed at Victoria occurred *after* the six-month period for filing a claim (or the one-year period for filing a late claim request) had already expired. In the fall of 1992, after charges were brought against Ancira and before he pleaded no contest, Ancira's sister-in-law harassed Victoria. Ancira's wife spread rumors about her and some District teachers sent a letter to the editor of a local newspaper supporting Ancira. All of these acts, however, occurred outside the relevant period when it was incumbent upon Victoria to file her government claim.

At trial, plaintiffs argued that the District should be estopped because "[t]he Manleys were painfully aware of the Ortegas' ordeal, and justifiably were afraid to face the same horrible treatment from the District." Victoria testified at length about her fear of humiliation and of people not believing her. Victoria's fear, however, was not the result of any act by the District or its employees directed at her.

---

[19]Following oral argument, plaintiffs submitted a letter brief to this court citing a new case, *Weeks* v. *Baker & McKenzie* (1998) 63 Cal.App.4th 1128 [74 Cal.Rptr.2d 510], that was allegedly relevant to the question we posed to plaintiffs at oral argument. The question we raised was: What affirmative acts did the District take during the period from Ancira's last molestation of Victoria (May 30, 1989) to the time she filed her government claim a little over four years later (July 9, 1993)?

Plaintiffs argued that *Weeks* was directly on point. In *Weeks*, the court affirmed a punitive damage award against a law firm for violating California's Fair Employment and Housing Act (§ 12940 et seq.), which was based on a male partner's sexual harassment of a female secretary. The law firm had received multiple prior complaints about this particular attorney but had taken no corrective measures of any kind. Under these circumstances, the court concluded that the law firm was liable to the secretary for creating a "hostile work environment."

Plaintiffs assert that *Weeks* is on point because the District acted through its employees, teachers, administrators, and coconspirators Ancira and Chang to create a hostile environment that deterred the filing of plaintiffs' claims.

We disagree. Unlike *Weeks*, this is not a punitive damage case; nor is it a Fair Employment and Housing Act case. The District has never, and could never, take the position that the jury's findings of negligent supervision and negligent hiring of Ancira were not warranted. The only issue we raised at oral argument was whether the plaintiffs acted within the time the Legislature has set for bringing *warranted* actions against a public entity. This issue was not raised in *Weeks*, which involved a private law firm, not a public entity. *Weeks* is inapposite.

For estoppel to apply, the public entity must engage in some sort of purposeful conduct or make a representation that leads *that particular plaintiff* not to take action against the public entity. (See, e.g., *Calabrese* v. *County of Monterey, supra,* 251 Cal.App.2d 131; *DeYoung* v. *Del Mar Thoroughbred Club, supra,* 159 Cal.App.3d 858; *Munoz* v. *State of California, supra,* 33 Cal.App.4th 1767, 1786.) After Victoria left Pajaro Middle School in June 1989, there were no actions by the District or any of its agents in the next six- or twelve-month periods that induced Victoria not to comply with the claims-presentation statutes.

In summary, while we are sympathetic with Victoria's situation, in applying the law of estoppel to the facts addressed at trial, we must conclude that there is no substantial evidence in the record that Victoria filed her government claim within a reasonable period after any event justifying an estoppel ceased to operate.[20] Because she failed to comply with the Tort Claims Act, her suit against a public entity is barred as a matter of law. (§ 945.4.) Accordingly, the remaining two issues, discussed in sections D and E of this opinion, relate only to Mona Lisa.

### D. *Comparative Fault*

■ The District argues that the verdict—assessing 100 percent of the fault to the District and none to Ancira and others—is not supported by the evidence. We agree.

The case was presented to the jury on three theories: negligence, intentional infliction of emotional distress, and conspiracy. As to Mona Lisa, the jury found that the District had been negligent[21] and that it had conspired "to hide evidence of prior molests, and/or to harass, intimidate, or coerce plaintiffs to recant or to delay filing claims." The jury found that the District had not intentionally inflicted emotional distress upon Mona Lisa or her family.

The jury determined that Mona Lisa had sustained economic damages of $50,000 and noneconomic damages of $1.5 million. As to her father, Arnold

---

[20]She filed her claim in July 1993, eight and one-half months after Ancira pleaded no contest and over six months after he was sentenced.

[21]The negligence consisted of "negligent supervision, negligent hiring, retention, [and] training . . . ." The jury was instructed that to find the District liable, it must find (1) that Ancira had engaged in acts of sexual misconduct prior to Mona Lisa's and Victoria's alleged molestations; (2) that the District knew or should have known of these prior acts of sexual misconduct; (3) that because of such prior acts, Ancira posed a reasonably foreseeable threat to students under his supervision; and (4) that the District failed to take all reasonable precautions to protect its students.

Ortega, it determined he sustained economic damages of $12,500, and noneconomic damages of $100,000. Finally, it determined that Arnold Ortega was 15 percent responsible for his own injuries.

In analyzing the question of whether the evidence supports the allocation of 100 percent fault to the District, we look only to the negligence and conspiracy theories, since the jury found that the District did not intentionally inflict emotional distress on Mona Lisa or Arnold Ortega. The negligence cause of action was predicated, as noted, on these theories: "negligent supervision, negligent hiring, retention, [and] training . . . ." These negligent acts would not, and could not, have caused any injury to Mona Lisa or her father *but for* Ancira's act of sexual molestation. Ancira was the actor; the District was the facilitator. It took the two together to cause Mona Lisa's injuries. Under *John R.* a school district may be liable for its own negligence in supervising and hiring a teacher who sexually abuses a student. The district may not, however, be held vicariously liable for the teacher's act of sexual misconduct. (48 Cal.3d at p. 441 ["We hold that the doctrine [of respondeat superior] is not applicable in these circumstances and that while the school district may be liable if its own direct negligence is established, it cannot be held vicariously liable for its employee's torts."].) In this case, the jury's verdict is logically and legally irreconcilable with the evidence: If Ancira's act of sexual molestation—for which the District was not responsible—did not in any way harm Mona Lisa, then the District was not negligent in failing to supervise him more closely and in allowing him to be alone with her. With respect to the negligence finding, the matter must be remanded for a retrial on the issue of fault allocation.

Plaintiffs respond that the jury's finding allocating 100 percent of the fault to the District may be upheld under the other theory the jury found applied to Mona Lisa's case—conspiracy. Citing numerous cases, including *Engalla* v. *Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951 [64 Cal.Rptr.2d 843, 938 P.2d 903], *Gutierrez* v. *Givens* (1997) (S.D.Cal. 1997) 989 F.Supp. 1033, and *Shuster* v. *Lyons* (Conn. Super. Ct. 1997) 1997 WL 472419, plaintiffs argue that conspirators may be held responsible for all the conduct of their coconspirators. However, to the extent they are arguing that the District may be held liable for the *sexual misconduct* of Ancira, their argument must fail. *John R.* makes it clear that a teacher's sexual abuse of a child is not an act for which a school district may be held responsible. The District can be held liable only for its own conduct which causes injury.

The wrongful acts the jury found the District had committed (i.e., hiding evidence of prior molests and/or coercing Mona Lisa to recant or to delay filing a claim) were both predicated upon Ancira's having molested Mona

Lisa. Those actions became wrongful only in the context of Ancira's independently wrongful act of molesting her. Unless Mona Lisa was molested, she would have no grounds for filing a government claim, and the District would have no need to coerce her into not filing her claim in a timely manner. In other words, like the negligence cause of action, the conspiracy cause of action hinges on a finding that Ancira was responsible for some of Mona Lisa's injuries. Furthermore, notwithstanding the cases cited by plaintiffs holding that a conspirator may be held responsible for the acts of coconspirators, the District cannot be held responsible for the act of Ancira in touching Mona Lisa's breast. (*John R.* v. *Oakland Unified School Dist.*, *supra*, 48 Cal.3d 438.)

In summary, the jury's verdict is impossible to reconcile with the evidence: Ancira was responsible for some of Mona Lisa's and her father's injuries. The District acting alone could not have been responsible for all of their damages. This issue must be remanded for a new trial on fault allocation.

■ The District also contends that the jury's finding that Arnold Ortega was responsible for 15 percent of his own injuries, but not responsible for any of Mona Lisa's injuries, is illogical and improper. We disagree. As the District acknowledges in its petition for rehearing, "[t]his was a question of substantial evidence." Under the substantial evidence test, the appellate court will not disturb the verdict of the jury or the findings of the trial court where the evidence is in conflict. It may not reweigh the evidence; rather it must defer to the jury's factual findings if there is any substantial evidence to support the findings. (*Hill* v. *City of Long Beach* (1995) 33 Cal.App.4th 1684, 1687 [40 Cal.Rptr.2d 125].)

Here, the jury was instructed pursuant to BAJI 16.00, question 6, "Assuming that 100% represents the total negligence and fault and wrongful conduct which was the cause of the plaintiff's injury and damage, what percentage of the 100% is due to the negligence and fault and wrongful conduct of the defendant School District, and what percent is due to all other persons?" The jury answered this question "100%" to the defendant and "0%" to other persons.

In closing argument, the District told the jury that the apportionment of fault was "the most important" question in the case, and it identified Ancira, Chang, Morales, and Socorro Ancira as some of the "other persons" who had caused injuries and damage to Mona Lisa. The District did not mention Arnold Ortega as a person partly responsible for his daughter's injuries.

The jury had all the facts before it to determine whether any other person's negligence or wrongful conduct contributed toward Mona Lisa's

injuries. After considering the conflicting evidence of wrongdoing on the part of Ancira, Chang, Morales, Socorro Ancira, and Arnold Ortega, the jury concluded that no party but the District was responsible for Mona Lisa's injuries. As we explained earlier, this finding was erroneous to the extent it impliedly ascribed Ancira's act of sexual molestation to the District, a result prohibited by the court in *John R.* v. *Oakland Unified School Dist.*, *supra*, 48 Cal.3d 438. However, based on the evidence before it, the jury was entitled to conclude that no other person—besides the District and its agent (for estoppel purposes, but not to establish vicarious liability) Ancira—was responsible for Mona Lisa's injuries. We see no reason to disturb the jury's verdict.

■ Finally, the District argues that the $70,000 Ancira settlement and the $10,000 Sylvia Morales settlements must be applied as an offset against the plaintiffs' judgments. We agree with respect to that portion of the Ancira settlement allocated to Mona Lisa and her family. The effect of an order adjudicating a settlement to be in good faith pursuant to Code of Civil Procedure sections 877 and 877.6 is to bar cross-complaints against parties who have settled and to provide an offset in the amount of the settlement to the subsequent liability of nonsettlors. (*Gouvis Engineering* v *Superior Court* (1995) 37 Cal.App.4th 642 [43 Cal.Rptr.2d 785].)

On the other hand, the $10,000 Sylvia Morales settlement should not be applied as an offset, unless part of that settlement was paid to the Ortegas. If, as we suspect, the Morales settlement was paid only to Victoria and her family, then it should not be applied as an offset in Mona Lisa's action against the District.

E. *Excessiveness of the Damages*

■ The question of whether the damages were excessive as a matter of law was put to the trial judge in the District's motion for new trial. In denying the motion, the court stated, "If this were a case of a loss of a leg or loss of an arm or loss of an eye, there is a wealth of background material one can look on in prior cases and jury verdicts to see what the normal range of damages would be. . . . [¶] I don't know of another case that comes anywhere close to the facts of this case with which to compare it in order to be able to say with some assurance that this verdict is excessive. Based on the lack of anything to gauge it against, even though I sort of have a gut feeling that it's too high, I don't really have any solid basis for saying that it's unconscionably high . . . ."

■ As a general rule, a "trial court's determination [on a motion for new trial based on excessive damages] is to be accorded great weight

because having been present at the trial the trial judge was necessarily more familiar with the evidence." (*Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 64 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878].) With this principle in mind, we examine the awards.

Economic damages are defined as "objectively verifiable monetary losses including medical expenses, loss of earnings, burial costs, loss of use of property, costs of repair or replacement, costs of obtaining substitute domestic services, loss of employment and loss of business or employment opportunities." (Civ. Code, § 1431.2, subd. (b)(1).) Mona Lisa was awarded $50,000 in economic damages and her father was awarded $12,500.

Arnold Ortega's damages are not excessive. He submitted evidence at trial that he incurred $12,440.28 in tuition costs to send Mona Lisa to Monte Vista Christian School after the molestation. As far as Mona Lisa, the only evidence she submitted of economic damages to date were receipts for counseling she has incurred since the molestation in the amount of $744. However, Mona Lisa also testified at length of the emotional problems she has suffered and continues to suffer because of the molestation and its aftermath. Although the District's expert opined that Mona Lisa would not benefit materially from counseling in the future, he did not state that it would not help her at all. After considering Mona Lisa's testimony, the jury (and the trial judge when ruling on the new trial motion) could reasonably conclude that Mona Lisa might require $49,256 in future psychiatric expenses.

 Noneconomic damages are defined as "subjective, non-monetary losses including, but not limited to, pain, suffering, inconvenience, mental suffering, emotional distress, loss of society and companionship, loss of consortium, injury to reputation and humiliation." (Civ. Code, § 1431.2, subd. (b)(2).) Mona Lisa was awarded $1.5 million in noneconomic damages; her father was awarded $100,000.

The District contends that the damages awarded here are excessive and improper and that most of the damages that plaintiffs were awarded were for "litigation stress," which is legally noncompensable. The District cites a number of cases for the proposition that the exercise of the "right to petition" may not be impaired or chilled through the imposition of tort damages and that this is one of the prices a free society pays for its adversary system of justice. (See, e.g., *Pacific Gas & Electric Co.* v. *Bear Sterns & Co.* (1990) 50 Cal.3d 1118 [270 Cal.Rptr. 1, 791 P.2d 587]; *Silberg* v. *Anderson* (1990) 50 Cal.3d 205 [266 Cal.Rptr. 638, 786 P.2d 365]; *Moore* v. *Conliffe* (1994) 7 Cal.4th 634 [29 Cal.Rptr.2d 152, 871 P.2d 204]; *Rubin* v. *Green* (1993) 4 Cal.4th 1187 [17 Cal.Rptr.2d 828, 847 P.2d 1044]; Civ. Code, § 47, subd. (b)(2).)

While we agree with those principles, we are not persuaded that Mona Lisa's emotional distress damages were simply "litigation stress." Mona Lisa's pain and suffering as a result of the Ancira affair were well documented at trial. She was rejected by her friends, family, and school officials. No one believed her. When she reported the incident to the principal, he put her into a room with windows where her fellow students could stare at her. For a shy, insecure, unsophisticated 12-year-old girl, this experience was traumatic. Then Ancira sued her for defamation and the District intervened in that action. She spent most of her high school years in her bedroom, with eating disorders, refusing to communicate with her parents or anyone else. She had no friends at all. Her appearance changed, she was angry, resentful, alienated from society. Her parents blamed her for the lawsuit, and her once-close relationship with her father was destroyed. For years, her tale followed her wherever she went: She was the girl who had leveled the "false charges" against a beloved, dedicated teacher. As a result, she changed schools often.

The jury concluded that $1.5 million was a reasonable sum to compensate Mona Lisa for the pain, suffering, and humiliation she has suffered and continues to suffer as a result of the Ancira incident. The trial judge, who also heard the evidence, refused to grant a new trial on the ground that this award was excessive. We find no abuse of discretion in this ruling.

The District also claims that plaintiffs' awards were the product of "improper passion, prejudice and sympathy, inflamed by persistent and repeated misconduct of counsel." It cites excerpts from plaintiffs' counsel's closing argument where he referred to the District as being run by powerful executives in a big board room, controlled by a CEO, sitting around a huge boardroom table, drinking champagne. When counsel made these comments, however, counsel for the District did not object. Under these circumstances, the District's misconduct claim is waived on appeal.

### III. DISPOSITION

The judgment is reversed as to the Manleys, and the trial court is instructed to enter judgment in favor of the District. As to the Ortegas, the matter is remanded to the trial court for a new trial, which shall be limited to an allocation of fault between the District and Ancira. In all other respects, the judgment is affirmed. Each side shall bear its own costs on appeal.

Bamattre-Manoukian, J., and Mihara, J., concurred.

Petitions for a rehearing were denied July 10, 1998, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied September 2, 1998.